IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| HOMETOWN FOLKS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 1:06-cv-81 |
| v. ) | |
| ) | MATTICE/CARTER |
| S & B WILSON, INC.; ) | |
| WILLIAM L. WILSON; and ) | |
| SALLY B. WILSON, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER

I. Introduction

The plaintiff's motion to compel defendant William L. Wilson to respond to interrogatories and requests to produce documents (Doc. No. 79) is before the undersigned Magistrate Judge and ripe for a decision. Plaintiff's motion also asks for sanctions and attorney's fees. The defendants' motion for a protective order in regard to the plaintiff's written discovery requests propounded to William L. Wilson is also pending (Doc. No. 87). For the reasons stated herein, it is ORDERED the plaintiff's motion to compel is DENIED and the defendants' motion for a protective order is GRANTED.

II. Relevant Facts

*A. Procedural History*

This action arises from a Purchase and Sale Agreement entered into by the parties on October 4, 2005 in which the defendants were to sell certain Burger King restaurants located in the North Georgia area to the plaintiff. Plaintiff alleges that the defendants have wrongfully

1

refused to complete the sale of the restaurants to the plaintiff thereby breaching the contract. Plaintiff seeks specific performance on the contract as well as damages.

Prior to the plaintiff's filing its motion to compel, the defendants filed on July 18, 2006 a Motion for a Protective Order. Plaintiff had noticed Mr. Wilson to take his deposition, and the defendants sought a protective order prohibiting the deposition (Doc. 27). On the same date, defendants filed a motion for a protective order concerning the plaintiff's notice to take the depositions of S&B Wilson, Inc. and Sally B. Wilson (Doc. 26). The basis for the defendants' motion for a protective order as to Mr. Wilson's deposition was two-fold. First, defendants argued that Mr. Wilson is not competent to testify due to dementia, and, second, he suffers from labile hypertension and is in such poor health that requiring him to undergo a deposition would subject him to serious and even life threatening illness. In support of their motion, defendants submitted the declaration of Dr. Roger D. Owens (Doc. 28-6) who stated:

> Mr. Wilson suffers from labile hypertension, which means that when he is put under stress, even mild or moderate in nature, he is subject to dangerous spikes in blood pressure which could cause a stroke or have other serious health consequences. Further, Mr. Wilson also suffers from dementia which directly affects his memory and causes frequent forgetfulness. Due to Mr. Wilson's overall health condition, I feel that if Mr. Wilson is subjected to even mildly stressful involvement in the litigation referenced above, it could prove detrimental to his health. I am confident that if he is subjected to the extremely stressful experience of a deposition, his health will be endangered. For these reasons, I urge the Court to exempt Mr. Wilson from any depositions or any other stressful activity in connection with these legal proceedings.

(Owens' declaration at ¶¶ 2-4).

Plaintiff countered that because Mr. Wilson executed the purchase and sale agreement at issue in this case at the time that he was President of S&B Wilson, Inc., his deposition is important to their case. (Plaintiff's Response to Defendants' Motions for Protective Orders, Doc.

42). Plaintiff then offered to take Mr. Wilson's deposition in his home, in two-hour segments, and with a nurse or physician on site. *Id*. at 6. A hearing was held on the motions for protective orders before the undersigned Magistrate Judge on August 11, 2006, in which counsel for the parties were present. During that hearing, the defendants agreed to withdraw their motion for a protective order as to Mrs. Wilson and S&B Wilson, Inc. The parties agreed that the plaintiff would depose S&B Wilson, Inc. and Mrs. Wilson, and the plaintiff would then determine whether it was still necessary to depose Mr. Wilson, and an order was entered to this effect. *See* Doc. 55.

After plaintiff deposed Mrs. Wilson and Bobby Ray Cross, an employee of S & B Wilson, plaintiff notified the defendants on or about September 26, 2006 that it still wanted to depose Mr. Wilson. Defendants then renewed their motion for a protective order as to Mr. Wilson. Counsel for the parties discussed the renewed motion for a protective order in a hearing held before me in this case on Friday, October 13, 2006. I advised the parties that absent an agreement between them concerning Mr. Wilson, I would need to conduct a hearing to receive evidence as to Mr. Wilson's mental and physical condition before I could rule on the defendants' motion for a protective order. However, it was my understanding, apparently mistaken, that the parties ultimately agreed that if Mr. Wilson would not testify at trial for any reason whatsoever, including rebuttal purposes, the plaintiff would agree not to depose him, and I entered an order to that effect on November 3, 2006. Thereafter, on November 17, 2006, plaintiff objected to this order under Fed. R. Civ. P. 72(a) on the ground that such an agreement had not been made and there was insufficient evidence presented to support the defendants' position that Mr. Wilson should not be deposed due to his physical and mental condition. Upon review, the District Court

on December 12, 2006, ordered that "Magistrate Judge Carter reconsider his Order of November 3, 2006, as such order lacks a sufficient evidentiary basis." (Doc. 86).

On November 3, 2006, the plaintiff filed a motion to extend the deadline to provide expert reports (Doc. 74). On November 21, 2006, I held a hearing with counsel for the parties to discuss the plaintiff's motion to extend the expert deadline. During the course of the hearing, it came to light that the plaintiff had served interrogatories and requests to produce on Mr. Wilson which were outstanding. Defendants' counsel stated Mr. Wilson was unable because of his mental and physical condition to respond to the discovery requests. On December 1, 2006, plaintiff filed a motion to compel Mr. Wilson to respond to the interrogatories and production requests. (Doc. 79). In response to the plaintiff's motion to compel, the defendants filed "Defendants' Response to Plaintiff's Motion to Compel and, Alternatively, Motion for Protective Order." (Doc. 87). On January 12, 2007, the undersigned held a hearing on the plaintiff's motion to compel. At this time, the defendants' motion for a protective order as to Mr. Wilson's deposition was still outstanding as the motion had been referred back to me by the District Court for further consideration. I decided that an evidentiary hearing was necessary before ruling on the plaintiff's motion to compel or on the defendants' motions for a protective order since there was no agreement that Mr. Wilson was too ill, physically and/or mentally, to be deposed or respond personally to written discovery requests.

On February 15, 2007, the undersigned Magistrate Judge held a hearing for the purpose of receiving evidence on the issue of whether the defendants' motions for a protective order regarding defendant William L. Wilson and the plaintiff's motion to compel responses to discovery from Mr. Wilson should be granted. The recent deposition of Mr. Wilson's treating

4

physician, Dr. Roger Owens, was an important piece of evidence introduced at the hearing. Following conclusion of the day's evidence on February 15, 2007, the undersigned agreed to leave the hearing open in order to give the plaintiff sufficient time to have its own medical expert review Dr. Owens' deposition and Mr. Wilson's medical records. Further, if the plaintiff so desired, the undersigned would then allow the plaintiff to call its own medical expert at a continuance of the evidentiary hearing on the defendants' motions for a protective order and the plaintiff's motion to compel. Plaintiff has declined to present its own medical expert and, by e-mail on July 17, 2007, the plaintiff notified the Court that it was withdrawing its objection to the undersigned's November 3, 2006 order granting a protective order prohibiting the plaintiff from deposing Mr. Wilson. Thus, the November 3, 2006 order stands. The plaintiff has also notified the Court, however, that it does not withdraw its motion to compel (Doc. 79) discovery responses from Mr. Wilson. Thus, plaintiff's motion to compel written discovery from Mr. Wilson and the defendants' motion for a protective order concerning this written discovery are outstanding.

## II. Relevant Evidence

In addition to Dr. Roger Owens' deposition, testimony from two other depositions were introduced into evidence at the February 15, 2007 hearing: Mrs. Sally Wilson's deposition and Mr. Bobby Ray Cross' deposition. Mrs. Wilson also testified at the February 15, 2007 hearing.

*Mrs. Wilson's Deposition*

Plaintiff deposed Sally Wilson, William Wilson's wife, on September 21, 2006. She testified to the following: Her husband is the President of S & B Wilson, and she is the Secretary and Treasurer. There are no other officers, shareholders or directors of the company. (Sally Wilson dep. at 7-8.). S & B Wilson operates Burger King franchises. *Id.* at 8. Mr. Wilson is 83

years old and unable to work a lot. *Id*. at 17. She works an average of forty-five hours a week running the Burger King restaurants owned by S & B Wilson. *Id*. In December of 2005, Mr. Wilson was having blackouts and chest pain and was in the hospital three times. He has a pacemaker and that has stabilized him somewhat. *Id.* at 18. When questioned about her husband's health, she testified, "I didn't want to say this, but my husband has dementia." *Id.* at 48. His dementia affects to a "certain extent" his ability to recognize and carry on conversations with individuals. *Id*. at 34. When one talks to Mr. Wilson, he will answer, but he might not remember what was asked five minutes later. *Id.* at 20. He does drive into the office by himself. *Id.* at 18. Mrs. Wilson tries to include Mr. Wilson in important meetings. *Id.* at 20. He makes some limited decisions regarding the business. *Id*. at 18. Her husband "is in charge of maintenance and ordering supplies" at the Burger King stores they operate, but those duties have "changed somewhat" over the past five years as she has had more day-to-day responsibility. *Id*. at 12. His responsibility in those areas is "very limited." *Id.* at 20. He is able to recognize and carry on conversations with individuals "to a certain extent." *Id.* at 19. Her husband was involved in their decision to sell their business in order to retire. *Id*. at 34. During the time that she was considering the contract with plaintiff to sell the restaurants, she and her husband met with their attorney five to six times over a thirty-to-sixty day period. *Id*. at 75-76. She and her husband met at least once with Gordon and Elliott Davenport in the office of the Wilsons' accountant. *Id*. at 85, 90. She and her husband discussed the results of the walk-through of their restaurants in June 2005 in anticipation of the sale of their restaurants, but Mr. Wilson did not offer any comments as to what repairs would cost because he is "not able to do that." *Id*. at 106-107. She did discuss with her husband the termination of the contract. *Id*. at 155. When asked

further about what she discussed with her husband she stated, "there was nothing in particular." *Id.* at 156.

### *Bobby Ray Cross' Deposition*

During his deposition given on September 21, 2006, Bobby Ray Cross testified to the following: he is the director of operations for S&B Wilson (Cross dep. at 5). Mr. Cross testified concerning major repairs at the Burger King restaurants owned by S & B Wilson, that "before I will authorize someone to do something, I go with Mrs. Wilson and Mr. Wilson to make sure that we are on the same page with it." *Id*. at 35. He also stated "I usually consult both of them because we include Mr. Wilson in it." *Id*. Mr. and Mrs. Wilson receive a quarterly accounting report. *Id*. at 38-39. He talks to Mr. Wilson daily and Mr. Wilson recognizes him and the people in the administrative office. *Id*. at 127. Mr. Wilson gives him instructions and, "for the most part" he follows the instructions. *Id*.

### *Sally Wilson's Testimony at the February 15, 2007 Hearing*

During the February 15, 2007 evidentiary hearing before the undersigned Magistrate Judge, Mrs. Wilson was called as a witness, and she testified to the following: While her husband is president of S&B Wilson, she "runs" S&B Wilson (Tr. 36)[1]. Mr. Wilson is unable to run the day-to-day business affairs of the company (Tr. 36). She and Mr. Wilson have owned the company for 28 years and during that time they have worked hand-in-hand in building the business (Tr. 36-37). However, in the past five years, his ability to remember has increasingly gotten worse (Tr. 40). Presently, Mr. Wilson drives himself less than a mile to the office. He follows the same route everyday that he has driven for the past twenty-eight years. He can stay

---

[1]All references to the Transcript are to the Transcript for the February 15, 2007 hearing.

on that route, but he can't get off it (Tr. 37). Mrs. Wilson will time him to make sure that he arrives at the office safely (Tr. 37). When he comes to the office, he seems fine outwardly but he is not fine (Tr. 37). They have lived in the same house for twenty years but he cannot remember where the glasses or cups are or where his clothes are located. He is unable to make a sandwich, and she has to make sure he takes his medication (Tr. 38). He is able to dress himself, but sometimes he can't locate his clothes. He is unable to use the telephone effectively (Tr. 38). She bought a telephone for him which is programmed with her number, the office number, and her granddaughter's number (Tr. 38-39). All he has to do to call one of those numbers is push 1, 2, or 3 but he is not able to do even that (Tr. 39). He is unable to use the office phone because he cannot remember to push a button on the phone to get an outside line (Tr. 39). In the past, Mr. Wilson did run the business and was a "dynamo" (Tr. 39). Sometimes he still accompanies her on business trips because she does not want to leave him home alone (Tr. 39). She tries to keep him informed about business discussions during these trips, but he is unable to remember what they are discussing (Tr. 40). While he used to be involved in overseeing and ordering supplies and repair and maintenance of stores, he has been unable to do that for about the last two years. An assistant picks up the phone and makes an order (Tr. 40). She still talks to him about the business and asks him his opinion (Tr. 41). She testified she wasn't sure why she did that and then stated, "he has been my partner for twenty-eight years. And I think he understands me when I say you know, what we're doing and what's going on and - - I don't know that he does but, you know, he enjoys it. I can tell by the look in the eyes he enjoys it." (Tr. 42). Mrs. Wilson

accompanied Mr. Wilson for a physical examination in January 2007[2] conducted by a neurologist, Dr. Hector Gotay. She heard Dr. Gotay ask Mr. Wilson what year it was, and her husband responded "1966 " (Tr. 42-43). She heard Dr. Gotay ask her husband what month it was, what day it was, and what season it was. Even though he was unable to answer any of those questions, he acted like he knew what he was saying. (Tr. 43). At the end of the visit, Dr. Gotay gave her the book entitled Thirty-Six Hours and told her, "you need to read this and prepare yourself." (Tr. 45-46). The book is about Alzheimer's disease (Tr. 46).

*Dr. Roger Owens' Deposition*

Dr. Owens' deposition was introduced into evidence at the hearing. In his deposition, Dr. Owens testified to the following: Dr. Owens is board certified in internal medicine and licensed to practice medicine in Georgia. He has been Mr. Wilson's treating physician since 1981. (Owens' Dep. at 6). Mr. Wilson has had hypertension for the past ten years which, in the past several years, has become more intense. *Id*. at 8. Just a little bit of stress can cause his blood pressure to go inordinately high. *Id*. at 9. His blood pressure has fluctuated from being too high and too low and has made it difficult to treat him. *Id*. In 2005, he was diagnosed with sick sinus syndrome, meaning he ultimately had to have a pacemaker. *Id*. "This inability of his heart to speed up appropriately probably meant that when he was stressed, [sic] maybe other people's heart would race as part of their response, and his could not, so his pressure simply went up, the lability in him was inordinate and of great concern to me." *Id*. At home, his blood pressure would drop but under any stressful situation, even a "friendly visit" to the doctor's office, his

---

[2]Mr. Wilson's medical records indicate the examination took place in January 2007. Owens-272.

9

blood pressure would spike. *Id*. at 10-11. Dr. Owens further testified that a deposition could cause Mr. Wilson to suffer a spike in blood pressure which could lead to hypertensive crisis causing "actual confusion, loss of vision, [and] of course, a stroke. It is a medical emergency." *Id* at 12- 13. At the time of Dr. Owens' deposition, Mr. Wilson was taking Topral and Plendil and taking baby Aspirin to lower his blood pressure and to stabilize it without causing it to go too low. *Id*. at 47. Mrs. Wilson takes blood pressure readings of Mr. Wilson at home and faxes them to Dr. Owens for his review about every two weeks. *Id*. at 48-50. These readings demonstrate the labile nature of Mr. Wilson's blood pressure. *Id*. at 48. Mr. Wilson visits Dr. Owens in his office about every three months. *Id*. at 52. Mr. Wilson's hypertension, due to its lability, is very difficult to control. "[T]his lability is just incredibly pronounced in him [sic] that he can be stressed a little bit, it goes up, and if we again treat that high, an hour later or six hours later it can be too low. So it's his chemistry, his physiology that has generated this lability." *Id.* at 55. In 2005, Mr. Wilson had several fainting episodes and had a pacemaker installed, but, shortly thereafter, he went into congestive heart failure. *Id*. at 29. Stress could accelerate his hypertension and not only give him a stroke, but also throw him into congestive heart failure. *Id*. A deposition would not be less stressful if Mr. Wilson's deposition were conducted with the doctor present. Mr. Wilson's pressure goes up even when he comes to Dr. Owens' office. *Id*. at 31.

Dr. Owens first officially diagnosed Mr. Wilson with dementia at least four years ago. *Id*. at 14. Later, in his office chart dated April 22, 2005, Dr. Owens noted mild dementia. *Id*. at 35. Dr. Owens did not limit Mr. Wilson's activities. *Id.* at 15. At the time Dr. Owens executed his affidavit in this case, he thought Mr. Wilson's dementia was "moderately severe." Mr. Wilson

would come to Dr. Owens' office and smile, shake hands, make some small talk, but couldn't give the day's date. The more questions Mr. Wilson was asked, it became clear he had "a more serious dementia." *Id*. at 14. He last saw Mr. Wilson on December 29, 2006. At that time, Mr. Wilson did not recognize him; Mr. Wilson thought he was another doctor. His dementia was definitely worse. *Id*. at 15. Dr. Owens decided he needed to re-examine Mr. Wilson's brain and vascular status to see if Mr. Wilson had had another stroke or a tumor. *Id.* at 15-16. A CAT scan demonstrated a stroke in the left thalamus. *Id*. at 16. Dr. Owens also conducted a mini-mental status examination. A normal score is 30 and most people score between 26-30. Mr. Wilson scored a 20 which is quite low. *Id*. at 16. A mini-mental status examination or MMSE is a universal office screening test for dementia. *Id*. at 16. If a person has previously had a stroke, it is more likely that they may have another stroke if subjected to stress. *Id*. at 17. Based on his December visit with Mr. Wilson, Dr. Owens referred Mr. Wilson to Dr. Hector Gotay, a neurologist, to examine Mr. Wilson to determine his degree of dementia. *Id*. at 17. Based on Dr. Gotay's report and his own observations, Dr. Owens opined that Mr. Wilson's mental state is consistent with profound dementia including profound memory loss as well as difficulty functioning. *Id*. at 21. He has deficits in memory recall, calculations, and integrating information, and "he just is impaired severely." *Id*. at 21. Mr. Wilson would be an incompetent witness. *Id.* "Layman's terms, I think this would be analogous to a person – blind person running an obstacle course or a crippled person running a race." *Id.* Dr. Owens was asked if Mr. Wilson's ability to drive his car to work was inconsistent with his diagnosis. Dr. Owens testified that it could be consistent because as people develop dementia which progresses, repetitive functions which have been there for years can remain and they can perform them quite

well. *Id*. at 22. A person might be able to drive a car, speak, and shake one's hand, and one would think the person is quite capable. However, further observations indicate otherwise. *Id.* at 22. Mr. Wilson is able to drive to the office and go to the gasoline station, but he cannot use his credit card by himself. Therefore he goes to one particular gas station where he is known, he gives a worker his credit card, and the worker processes it for Mr. Wilson. Then Mr. Wilson leaves. *Id*. at 23. Dr. Owens first diagnosed Mr. Wilson as having severe dementia on December 29, 2006. *Id*. at 38. When asked if Mr. Wilson would be able to comprehend the difference between telling the truth and telling a lie, Dr. Owens responded, "having known him twenty-five years, I would say Mr. Wilson is a person of impeccable integrity. I don't think he would knowingly lie but he is so impaired, I know he gave me false answers in trying to help me answer the questions, so I don't think it would be intentional." *Id*. at 43. When asked if Mr. Wilson would be able to say, "I don't know" if asked a question he did not know the answer to, Dr. Owens responded that he did not think Mr. Wilson would be able to do that. Dr. Owens thought he would give a false answer without knowing the answer was false. *Id*. at 43-44. Mr. Wilson does not have the ability to determine whether he knows an answer or not. *Id*. at 44.

*Dr. Owens' Treatment Records for Mr. Wilson*

Dr. Owens' records for Mr. Wilson were also introduced into evidence during the February 15, 2007 hearing. In June of 1990, Mr. Wilson was admitted to the hospital for treatment of a "confusional state." Mrs. Wilson reported her husband's memory appeared to be deteriorating, and he was having episodes of confusion. Mr. Wilson was then sixty-seven years

old (Owens-46)[3]. As early as July 1990, Mr. Wilson began experiencing "episodic profound memory loss." Dr. Owens noted transient amnesia but was not sure of the cause. (Owens-39, 42.) Mr. Owens' continued mental deterioration, referred to as "dementia" by at least October of 2002, is well documented in the records. (*See* Owens-16-17, 19-26). As early as July 2002, Dr. Owens was prescribing medication to slow progression of Mr. Wilson's dementia, and Mr. Wilson has continued to take such medications ever since. (Owens-2, 16, 17, 21, 23). Further, Mr. Wilson's labile hypertension and the difficulty in appropriately managing it is well documented in Dr. Owens' numerous treatment notes over the past ten years. (*See* medical records generally).

*Dr. Hector Gotay*

Dr. Hector Gotay, M.D., a neurologist, examined Mr. Wilson in January of 2007. In a letter dated January 19, 2007 and introduced into evidence at the February 15, 2007 hearing, Dr. Gotay wrote to Dr. Owens:

> I had the pleasure of seeing Mr. Wilson who, as you know, has senile dementia Alzheimer's type. The mini-mental status examination today demonstrated a score of 17 out of 30 which placed him in the severely demented category.
>
> ....in general, his judgment would be considered totally unreliable. The patient has a very poor memory at this time and I don't think he will be able to contribute anything with his testimony.

(Owens-272.)

---

[3]Mr. Wilson's medical records were admitted as defendants' Exhibit 2. Pages are Bates Stamped as Owens ____.

III. Analysis

Plaintiff served by hand delivery on October 20, 2006, twenty-two interrogatories and sixteen requests to produce on defendant William Wilson . Defendants, by counsel, responded sixteen requests to produce on defendant William Wilson. Defendants, by counsel, responded on November 20, 2006 and objected to every discovery request on the basis of a single "general objection" which states as follows:

> Counsel for Mr. Wilson objects to these discovery requests on the basis of the Order entered in this case on November 3, 2006, [Court document 71] which excuses Mr. Wilson from testifying in this action. Objections made by Defendants Sally B. Wilson and S & B Wilson, Inc. to the same discovery are incorporated herein by reference.

(Defendant William L. Wilson's Response to Plaintiff's Discovery Requests, Doc. 79-3, Ex. B).

Plaintiff argues that the undersigned's November 3, 2006 order relates solely to whether Mr. Wilson would be deposed and could testify at trial; it has nothing to do with whether he should respond to written discovery requests. Plaintiff further argues that Mr. Wilson has valuable information which the plaintiff is entitled to know. The defendants respond that because of his dementia and his shrinking role in running S & B Wilson, Mr. Wilson has no personal knowledge relevant to this case and should not, therefore, be compelled to answer the interrogatories. Defendants further assert "Mr. Wilson does not possess any documents used in the S & B Wilson business, and Mr. Wilson is unable to provide anything not already provided by S & B Wilson and Mrs. Wilson in response to Plaintiff's request for production." (Defendants' Response at 2-3, Doc. 87). Further, defendants move for a protective order as to the plaintiff's written discovery requests. *Id.* at 3.

In its reply, the plaintiff argues that (1) the defendants assert for the first time in their

14

response to the plaintiff's motion to compel that Mr. Wilson is mentally and physically unable to respond to the plaintiff's written discovery, (2) that this particular objection is made outside the response time required under Rules 33 and 34 of the Federal Rules of Civil Procedure, and (3) therefore, the objection is waived.

Rule 34(b) gives a party 30 days to respond to a request for production of documents. Rule 33 provides 30 days to respond to interrogatories and states:

> All grounds for an objection to an interrogatory shall be stated with specificity. Any ground not stated in a timely objection is waived unless the party's failure to object is excused by the court for good cause shown.

Fed. R. Civ. P. 33(b)(4). In a strictly technical sense, the defendants probably did fail to state in a timely manner their specific objection to the interrogatories propounded on Mr. Wilson before the defendants served their response to the plaintiff's motion to compel. My order of November 3, 2006 does not mention that Mr. Wilson has physical or mental difficulties which preclude him from being deposed. Since I thought the matter had been resolved by agreement, I simply did not address the merits of those issues in the order. The order simply reflects what I thought the agreement to be, not the reasons for it. Nor did the order discuss Mr. Wilson's inability to participate in other forms of discovery.

Nevertheless, I find good cause exists to excuse what is arguably a technically late assertion of an objection. The defendants consistently have maintained that Mr. Wilson should not be deposed due to his dementia and his labile hypertension. These issues were fully briefed and discussed before the undersigned on several occasions.[4] Even though I may have been

---

[4]Mr. Wilson's mental and physical condition were among the topics of discussion, to at least some degree, with the undersigned and counsel during discovery conferences on October 30, 2006; November 3, 2006; and December 19, 2006, in addition to the other hearing dates

mistaken that the parties had reached an agreement to resolve the defendants' motion for a protective order concerning deposing Mr. Wilson when I entered the November 3, 2006 order, there was no doubt that the purpose of the order was to resolve those issues raised by the defendants' motion for a protective order. I conclude plaintiff should have been aware by reference to the November 3, 2006 order and discussions that preceded it that defendants were raising Mr. Wilson's mental and physical conditions as a basis for objecting to the written discovery. In any event, plaintiff has been given ample opportunity with ample advance notice to address the merits of this issue, both on February 15, 2007 and later. Therefore, I conclude that the plaintiff suffers no prejudice by my declining to find the defendants' "general objection" waived.

Defendants' argument that Mr. Wilson's labile hypertension precludes him from participating in discovery carries less weight when considered in the context of written discovery as opposed to a deposition. While depositions often can become tense and even hostile as one party is interrogated by the opposing party's attorney, usually in the presence of the opposing party, interrogatories and requests to produce are addressed outside the presence of opposing attorneys and opposing parties. Rather, whether the court should compel Mr. Wilson to respond to the written discovery hinges on his mental competence to do so. Fed. R. Civ. P. 26(b)(2)(C)(iii) gives this court authority to limit discovery methods otherwise permitted under the Federal Rules of Civil Procedure if the court determines that "the burden or expense of the proposed discovery out weighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the

---

already mentioned herein.

litigation, and the importance of the proposed discovery in resolving the issues."

It is possible to take isolated pieces of testimony from Mrs. Wilson's or Mr. Cross' deposition testimony and argue that Mr. Wilson is mentally capable of answering interrogatories. However, when considering as a whole all the evidence presented to the undersigned on February 15, 2007, it is unequivocally clear that requiring Mr. Wilson to answer the interrogatories propounded to him by the plaintiff would be a fruitless exercise. While Mr. Wilson is able to continue to do certain routine tasks and can appear at times on the surface to be quite normal, his capacity to remember what was said or what happened even a few minutes ago is significantly diminished. To the extent he has participated in the S & B Wilson business in the last two years, it is because his wife has brought him with her when she conducts business. He has been merely present; he himself has not made the decisions concerning the business beyond, perhaps, asking an assistant to order some routine supplies. Mr. Wilson could not order the supplies himself because he doesn't know how to use the office phone. Mr. Wilson's medical records establish a long, gradual deterioration of his mental status beginning years before the parties discussed the sale of the defendants' Burger King restaurants to the plaintiff and increasing sharply within the last few years. The only medical experts in the record opine Mr. Wilson's dementia has, in the last year, become severe, and there is no medical evidence to the contrary. To the extent Mr. Wilson may have understood what he was doing when he signed the sales contract at issue on October 4, 2005, he is not now, and has not been for at least the past year, capable of relating that understanding to someone else due to a seriously impaired memory and an inability to recognize where his memory is faulty. Simply put, Mr. Wilson does not know what he does not know. For example, during a doctor's visit in January 2007 when asked what year it was, Mr. Wilson

answered with confidence that the year was 1966.  Dr. Owens testified he did not think Mr. Wilson would intentionally lie to answer a question but he is so impaired that he would not know when he gave a wrong answer.  Given all the evidence presented, I conclude that Mr. Wilson's memory is completely unreliable and he is incapable of responding competently to the plaintiff's interrogatories or the plaintiff's requests to produce documents.[5]  In fact, requiring an 83 year-old man with severe dementia and labile hypertension to be subjected to even a scintilla of stress in order to personally respond under oath to interrogatories where no likely benefit exists constitutes embarrassment, oppression, and undue burden justifying a protective order under Fed. R. Civ. P. 26(c).

I find this situation similar to that in *Miller v. Holzmann*, 238 F.R.D. 111 (D.D.C. 2006). In *Miller*, defendant did not answer interrogatories under oath because he suffered from dementia.  Defendant's neuropsychologist opined that the defendant suffered from "dysnomia, a condition making it difficult for the defendant to remember names or recall words needed to speak or write and agnosagosia, a condition that means that he thinks he is giving truthful answers to questions when he, in fact, does not know the answer." *Id.* at 111.  The plaintiff asked the court to appoint a guardian under Fed. R. Civ. P. 17(c) for the defendant to answer the questions under oath.  The court declined to do so, however, on the ground that the defendant had executed a limited power of attorney authorizing a "Dispute Resolution Committee" to act for

---

[5]In addition, Mr. Wilson's attorney in the response to the plaintiff's motion to compel stated that Mr. Wilson personally has none of the documents requested by the plaintiff. Defendants' Response at 2, Doc. 87.  This statement was made pursuant to the requirements of Fed. R. Civ. P. 11, and I accept this representation as having been made following a reasonable investigation on the part of Mr. Wilson's counsel.  Mr. Wilson himself is not capable of determining what documents he has or doesn't have.  Further, Mr. Wilson cannot be compelled to produce what he does not have.

him on his behalf in regard to this lawsuit. The court ordered that the Dispute Resolution Committee answer the interrogatories under oath on the defendant's behalf. *Id.* at 112. In the instant case, the corporate defendant, S & B Wilson, and Mrs. Wilson have responded to the same interrogatories and requests to produce that were sent to Mr. Wilson. Aside from Mr. Wilson, Mrs. Wilson is the only officer and stockholder of S & B Wilson. At least for purposes of the written discovery at issue, "the discovery sought" ... [has been] "obtainable from some other source that is more convenient, [and] less burdensome...." Fed. R. Civ. P. 26(b)(2)(C)(ii). Further, the undersigned can conceive of no better source than Mrs. Wilson to respond to the written discovery since Mr. Wilson is unable to do so.

### IV. Conclusion

I conclude pursuant to Fed. R. Civ. P. 26(b)(2)(C)(ii) and (iii), it is appropriate that the plaintiff's motion to compel be DENIED, and pursuant to Fed. R. Civ. P. 26(c), that the defendants' motion for a protective order as it applies to the plaintiff's motion to compel responses to interrogatories and requests to produce from Mr. Wilson be GRANTED.

SO ORDERED.

ENTER:

                                               s/William B. Mitchell Carter
                                               UNITED STATES MAGISTRATE JUDGE